**STATE**

v.

**Oliver S. LYONS.**

**No. 2005–203–C.A.**

Supreme Court of Rhode Island.

June 14, 2007.

Ronald R. Gendron, Esq., Providence, for Plaintiff.

Oliver S. Lyons, pro se.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON.

## OPINION

Chief Justice WILLIAMS, for the Court.

The defendant, Oliver S. Lyons (defendant), appeals *pro se* from a judgment of conviction on one count of assaulting a correctional officer with bodily fluids in violation of G.L.1956 § 11–5–8.1. This case came before the Supreme Court for oral argument on April 10, 2007, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments and examining the memoranda filed by the parties, we are of the opinion that this appeal may be decided at this time, without further briefing or argument. For the reasons set forth below, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

Correctional Officer Robert Dennett (Officer Dennett) began his work day on June 13, 2002, much like any other day. However, it soon took a decided turn for the worse. What ensued formed the basis of defendant's trial, at which defendant only contested the nature of his assault on Officer Dennett.

At trial, Officer Dennett testified that he was assigned to defendant's cell block in the High–Security Center (HSC) of the Adult Correctional Institutions (ACI) from 7 a.m. until 3 p.m. that day. At approximately 1 p.m., while collecting Styrofoam trays and cups from the inmates after lunch, he opened the food slot[1] in defendant's cell door and started to lift a plastic bag so defendant could dispose of his trash. Officer Dennett saw defendant reach for a cup on his sink/toilet unit, assuming defendant was going to throw it away. Instead, to Officer Dennett's dismay, defendant flung the cup's contents through the food slot at Officer Dennett, splashing the fluid onto his uniform and into his eye. Officer Dennett testified that defendant, after throwing the liquid, inquired, "How do you like that piss and sh* * all over you, you f* * *in' a* *hole?" Officer Dennett said that the liquid had the foul odor of urine and feces. After closing the food slot, Officer Dennett turned toward the control center[2] and saw Duty Officer Doug Worden (Officer Worden) standing at the window watching the incident.

Officer Dennett walked to the control center, where Officer Worden phoned Shift Commander Captain Anderson, who sent Officer Dennett to the prison nurse's office. Once there, Officer Dennett removed his shirt, where a majority of the liquid had landed, and he had his eye examined and flushed. He was then sent to Kent County Hospital, where he received a tetanus shot, had his eye flushed again, and had blood taken to determine whether he had contracted any diseases from the fluid that entered his eye. He testified that an officer photographed him and his shirt, and that he put the soiled shirt into a bag, which he gave to Department of Corrections (DOC) Inspector Renald Langlois (Inspector Langlois), who placed it in the locked trunk of his vehicle. Officer Dennett placed the pants he was wearing when the incident occurred in a plastic bag and stored them in his garage until a few days later when he gave them to Inspector Langlois, who photographed them.

During cross-examination, Officer Dennett testified that defendant was the most difficult inmate he had ever dealt with in his seventeen years as a correctional officer. He stated that defendant was extremely hostile and violent and had been "booked" more than 400 times for various infractions. He admitted, however, that defendant had never before been charged with assaulting an ACI officer during his five years of incarceration in the HSC.

Officer Worden also testified for the state. He said that he was working as the control officer for the DOC on June 13, 2002. He testified that at about 1 p.m., he

---

1. Officer Dennett explained that, because the inmates are incarcerated behind electronic doors and their cells are entirely enclosed, to deliver an inmate's food or retrieve the trash after the meal is finished, an officer must key open a food slot, which is like a trap door that opens parallel to the floor and acts as a shelf for passing trays or cups into or out of the cell.

2. The control center is a glass-enclosed room housing a duty officer who observes the cell block and radios for assistance in the event of a disturbance.

saw a liquid substance project out of defendant's cell through the food slot at Officer Dennett. Officer Worden testified that the liquid splashed onto Officer Dennett's chest area, soiling his uniform. Officer Worden said that he smelled urine on Officer Dennett when he came into the control center moments later.

The state next presented the testimony of Officer Nicholas Violante (Officer Violante). On June 13, 2002, Officer Violante was stationed in the module adjoining the module where defendant was housed.[3] He was told to report to defendant's module because an officer had been "served" [4] with a liquid substance. When Officer Violante arrived at defendant's module, he saw that Officer Dennett had a liquid substance on his shirt and pants that smelled strongly of urine. He testified that he told Officer Dennett to remove his shirt and place it in a plastic bag to preserve it for the DOC inspectors. Officer Violante later escorted defendant to the infirmary. Officer Violante testified that, while there, defendant asked him, "How does Officer Dennett feel now with sh* * and piss in his face?"

Inspector Langlois testified that he was employed by the DOC and, on June 13, 2002, he was asked to investigate an allegation that defendant had "served" an officer with urine and feces. Inspector Langlois testified that he was given photographs of Officer Dennett with his soiled shirt. He also testified that he conducted a number of interviews and searched and photographed defendant's cell, where he found two Styrofoam cups on top of defendant's sink/toilet unit. Inside one of those cups, Inspector Langlois saw a dark-colored speck and a small residue of liquid; he seized both cups, which he photographed. Inspector Langlois met with Rhode Island State Police (State Police) Corporal James Dougherty (Cpl.Dougherty) and turned over the evidence he had collected, including the cups, Officer Dennett's soiled shirt and pants and the witness statements. They also discussed whether to preserve or discard the physical evidence. They concluded that the items should be discarded so that they would not contaminate areas of the DOC where inmates and staff have access. In addition, Inspector Langlois testified that the evidence collected was not scientifically tested because of "biohazard contamination" and that the policies governing the collection and preservation of evidence do not address evidence that is contaminated with urine or feces. Instead, Inspector Langlois testified that, for the past ten years, it has been the DOC's standing practice to dispose of such items without testing.

Corporal Dougherty testified that on June 13, 2002, he was assigned to the State Police unit responsible for investigating incidents at the ACI. Pursuant to that assignment, he met Inspector Langlois at the ACI and was briefed on the statements and evidence that Inspector Langlois had collected. Corporal Dougherty testified that they examined and photographed the evidence outside of the ACI building for fear that the items were biohazard material. Although retention was possible in one of the biohazard refrigerators in each of the State Police barracks, Cpl. Dougherty

---

**3.** The High–Security Center (HSC) of the Adult Correctional Institutions, where defendant was housed, is a self-contained, maximum-security facility divided into two twenty-four-bed modules and four twelve-bed modules. It would appear that a module is a separate wing of the HSC.

**4.** Officer Violante explained that being "served" is a slang term used when an officer has some type of liquid thrown at him by an inmate.

and Inspector Langlois decided against retaining the evidence because the witness statements were sufficient. Corporal Dougherty also testified that he could not remember a time when urine- or feces-stained clothing was ever retained for evidence.

The defendant did not contest the fact that he threw something at Officer Dennett on June 13, 2002. What he disputed was the makeup of the concoction thrown, which he adamantly denied was a mixture of feces and urine.

On the basis of these facts, defendant was charged by criminal information with one count of assault with bodily fluid in violation of § 11–5–8.1. The state later gave notice of its intention to prosecute defendant as a habitual offender pursuant to G.L.1956 § 12–19–21. The defendant's two-day trial began on February 7, 2005, and, on February 10, 2005, the jury returned a verdict of guilty. The defendant thereafter moved for a new trial, which motion was heard on February 17, 2005. At the hearing, defendant argued that it was improper for investigators to have "knowingly discarded all evidence for alleged biohazard reasons." He also argued that several of the state's witnesses committed perjury and that he had been subjected to mistreatment and retaliatory bookings by ACI staff. The trial justice denied defendant's motion and, on April 7, 2005, defendant was sentenced to five years imprisonment on the charge of assault with bodily fluid, to be served consecutively to the sentence he then was serving. He was also deemed a habitual offender and, accordingly, was sentenced to twenty-five years imprisonment, two to serve without parole consecutively to the five-year assault sentence, the remainder suspended, with twenty-three years probation. The defendant filed an appeal to this Court.

## II

## Analysis

The defendant advances a number of arguments on appeal: (1) the trial justice erred in denying his motion for a new trial; (2) the trial justice abused his discretion in restricting defendant's right to cross-examine witnesses concerning possible motive and bias; (3) the trial justice erred in failing to find that State Police and ACI officials acted in bad faith when they destroyed Officer Dennett's uniform, thus preventing the defense from examining or testing it for the presence of bodily fluid; (4) the trial justice exhibited "judicial bias" and "a high degree of antagonism toward the defendant" in the presence of the jury; and (5) the trial justice erred in deeming defendant a habitual offender pursuant to § 12–19–21.

## A

## Cross–Examination

■ The defendant argues that the trial justice abused his discretion when he "fail[ed] to allow effective cross-examination into possible motive and bias" on the part of the ACI staff who testified at trial. He contends that he should have been allowed to inquire into a federal lawsuit defendant had filed against members of the ACI staff that was pending at the time of trial. He also argues that he should have been permitted to elicit evidence pertaining to physical injuries he claimed he had suffered at the hands of the correctional officers.

■ "The Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution unquestionably grant a criminal defendant the right to cross-examine witnesses who testify against him at trial." *State v.*

*Briggs,* 886 A.2d 735, 744 (R.I.2005). However, the scope of a defendant's cross-examination is not unlimited and may be restricted by the trial justice, for the defendant "has only 'reasonable latitude' to inquire into the bias, motive or prejudice on the part of a witness." *Id.* at 745 (quoting *State v. Werner,* 831 A.2d 183, 209 (R.I.2003)). This Court affords a trial justice wide discretion to permit or limit defendant's cross-examination of a trial witness and, absent a showing of clear abuse of discretion, we will not disturb a trial justice's ruling on appeal. *State v. Oliveira,* 730 A.2d 20, 24 (R.I.1999). In the event that this Court reverses a trial justice's ruling, we do so only "if such abuse constitutes prejudicial error." *Id.*

In this case, defendant sought to impeach Officer Dennett by inquiring into a federal court complaint and summons defendant filed, which he believed already had been served upon the officer because defendant allegedly had received an answer to his complaint. The trial justice initially allowed defendant to develop this line of questioning. However, once Officer Dennett stated that he had no knowledge of said complaint or summons, the trial justice instructed defendant to move on because the witness did not have personal knowledge. At this time, defendant neither made an offer of proof nor did he alert the trial justice that he possessed any documents that may have existed to support his contention.

Our review of the transcript reveals that, rather than impermissibly restricting defendant's right to cross-examine witnesses, the trial justice was quite lenient and provided defendant with great leeway to question witnesses and comment on alleged motive or bias. Therefore, we hold that the trial justice was well within his discretion when he limited defendant's cross-examination.

**B**

**Bad Faith Destruction of Evidence**

■ The defendant next argues that the trial justice erred in failing to find that the police and correctional officers acted in bad faith when they destroyed Officer Dennett's uniform and the Styrofoam cups confiscated from defendant's cell. The defendant's argument, however, is entirely without evidentiary support. As previously stated, the correctional officers and the State Police officers who testified at trial agreed that it was not either agency's procedure to preserve uniforms soiled with bodily fluids. Furthermore, the remedy for the state's decision to destroy this evidence was an instruction on the law of spoliation, which no one disputes was properly presented to the jury by the trial justice.[5] The jury was free to accept defendant's spoliation argument or to reject it if it felt insufficient evidence was presented to support his allegation. Therefore, defendant's argument fails.

---

5. The trial justice instructed the jury on spoliation of evidence as follows:

"The deliberate or negligent destruction of evidence by a party—here, the state—may, depending upon all of the surrounding circumstances, give rise to an inference that the destroyed items, had they been preserved, would have adversely affected the state's case against the defendant. You may draw such an inference if, for example, you find that the clothing was destroyed by the state in an effort to suppress the truth, or that it was intentionally destroyed in order to prevent the defendant from later examining or testing it for the presence of bodily fluid. On the other hand, such an adverse inference may not be warranted if the circumstances surrounding the destruction of the clothing demonstrate a matter of reasonable routine without fraudulent intent."

## C
### Judicial Bias

■ The defendant also alleges that the trial justice was biased against him. He argues that the trial justice made inappropriate comments in the presence of the jury directly related to an element needed to be proved by the state.

■ When a defendant alleges judicial bias, he "carries a substantial burden of proof to show that the asserted prejudice impaired the fairness of the trial." *In re Shawn B.*, 864 A.2d 621, 624 (R.I.2005) (citing *In re Michael T.*, 796 A.2d 473, 474 (R.I.2002) (mem.)). This Court previously has held that " 'mere criticism is not sufficient' to establish judicial bias." *Notarianni v. Carter*, 797 A.2d 1075, 1075 (R.I. 2002) (mem.) (quoting *Olivieri v. Olivieri*, 760 A.2d 1246, 1252 (R.I.2000)).

To support his claim, defendant specifically points to a number of the trial justice's comments. First, he directs us to the following exchange:

"THE DEFENDANT: * * * Well, to throw liquid out a trap like that with a cup—and I brought this. This is a cup?

"THE COURT: It better be empty, Mr. Lyons."

The defendant next highlights a number of the trial justice's remarks that he argues went beyond mere reprimand and instead instilled in jury members' minds what defendant contends was the trial justice's "displeasure and overall dislike of the defendant." These comments include, "No, you are not going to do that," "No, we don't do it that way," and "Don't do it again."

Our review of the transcript reveals that defendant's assertion is entirely unsupported. Contrary to defendant's arguments, the transcript details the trial justice's respectful attempts to rein in defendant and guide him in comporting with court rules. Although the trial justice's comment that defendant's cup "better be empty" may be considered inappropriate when viewed in isolation, in the context of defendant's behavior at trial, it does not rise to the level of judicial bias. We are mindful that the trial justice was confronted with a potentially volatile and unrestrained *pro se* defendant who resorted to the use of demonstrative evidence. The defendant admitted that he used a Styrofoam cup to throw a liquid at Officer Dennett and he did not object to the judge's comment. Thus, we are satisfied that the trial justice's admonition, in the context of defendant's trial, did not rise to the level of judicial bias.

Furthermore, rather than evidencing a dislike or antagonism toward defendant, the transcript reveals the trial justice's patience with defendant, who was consistently ill-behaved, argumentative, and volatile. In fact, it was defendant himself who time and again showed complete disrespect for the trial justice, culminating in his comments at sentencing, which included the following exchange:

"THE DEFENDANT: I don't want to listen to you. Frankly, I think you're pompous, ignorant. I think you're a son-of-a-bi* * *. That is all I have got to say. * * *

"THE COURT: Mr. Lyons.

" * * *

"THE DEFENDANT: Yes, sir. You may—well, you said to me, Your Honor, may I get five years throwing bodily fluid through your head, up in the air, you know. You're a joke. F* * *in' joke."

Even in the face of these deplorable and odious comments—which no judge should be forced to tolerate—the trial justice remained professional and respectful when speaking to defendant. We therefore un-

equivocally conclude that the trial justice maintained the requisite judicial impartiality and that defendant's assertions are without merit.

## D

### Habitual Offender Designation

■ Additionally, in a handwritten addendum to his brief, defendant argues that he should not have been deemed a habitual offender pursuant to § 12–19–21,[6] because he previously had not been convicted of two or more felony offenses and because the state failed to file notice within forty-five days of his arraignment. However, because defendant failed to raise this issue at the time of trial, it has not properly been preserved for our review.

■ "[I]t is an established rule in Rhode Island that this Court will not review issues that are raised for the first time on appeal." *Richard v. Richard,* 900 A.2d 1170, 1178 (R.I.2006) (quoting *In re Amber P.,* 877 A.2d 608, 619 (R.I.2005)). Thus, our well-established raise-or-waive rule precludes this Court from addressing arguments raised on appeal that first were not presented to the trial justice for review. *State v. Mohapatra,* 880 A.2d 802, 810 (R.I.2005).

The defendant's arguments concerning his designation and sentencing as a habitual offender were not raised before the trial

---

6. General Laws 1956 § 12–19–21 provides, in relevant part:

"Habitual criminals.—(a) If any person who has been previously convicted in this or any other state of two (2) or more felony offenses arising from separate and distinct incidents and sentenced on two (2) or more occasions to serve a term in prison is, after the convictions and sentences, convicted in this state of any offense punished by imprisonment for more than one year, that person shall be deemed a 'habitual criminal.'

justice. Consequently, defendant has waived these issues on appeal.

## E

### Motion for New Trial

■ Finally, defendant argues that the trial justice erred in denying his new-trial motion because the evidence presented at his trial failed to prove beyond a reasonable doubt an essential element of the crime charged, namely, that the substance thrown at Officer Dennett was a bodily fluid. He maintains that the evidence adduced by the state merely raised a suspicion or conjecture of guilt because the record is devoid of any physical evidence establishing the exact nature of the concoction thrown at Officer Dennett. He attributes the state's inability to provide Officer Dennett's uniform and the Styrofoam cups to a bad-faith plot to destroy all evidence that might have exonerated him, which violated State Police and ACI policies. Again, we disagree.

■ When this Court reviews a denial of a motion for a new trial, we affirm the trial justice's decision "unless it is 'clearly wrong or unless the trial justice, in reviewing the evidence, overlooked or misconceived relevant and material evidence.'" *State v. Grayhurst,* 852 A.2d 491, 520 (R.I.2004) (quoting *State v. Dyer,* 813 A.2d 71, 75 (R.I.2003)). When a trial justice decides a motion for a new trial, he

"(b) Whenever it appears a person shall be deemed a 'habitual criminal,' the attorney general, within forty-five (45) days of the arraignment, but in no case later than the date of the pretrial conference, may file with the court a notice specifying that the defendant, upon conviction, is subject to the imposition of an additional sentence in accordance with this section; provided, that in no case shall the fact that the defendant is alleged to be a habitual offender be an issue upon the trial of the defendant, nor shall it be disclosed to the jury."

or she "acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Luanglath*, 863 A.2d 631, 637 (R.I.2005) (quoting *Grayhurst*, 852 A.2d at 520). If, in doing so, the trial justice "reaches the same determination as did the jury, or if the justice determines that reasonable minds could have differed in reaching the verdict * * *," the motion should be denied. *Id.* (quoting *Grayhurst*, 852 A.2d at 520).

This Court has held that "circumstantial evidence 'alone may be sufficient to prove guilt beyond a reasonable doubt.'" *State v. Loccisano*, 864 A.2d 609, 612 (R.I.2005) (quoting *State v. Zmayefski*, 836 A.2d 191, 196 (R.I.2003)). The state can satisfy its burden of proof without disproving all possible speculations or inferences of innocence, so long as "the totality of the circumstantial evidence offered constitutes proof of guilt beyond a reasonable doubt." *State v. Caruolo*, 524 A.2d 575, 581 (R.I.1987) (citing *In re Derek*, 448 A.2d 765, 768 (R.I.1982)). Thus, "[t]he pivotal question in determining whether circumstantial evidence is sufficient to prove guilt beyond a reasonable doubt is whether the evidence in its entirety constitutes proof beyond a reasonable doubt or is of such a nature that it merely raises a suspicion or conjecture of guilt." *Id.* If, however, "the initial inference * * * rests upon an ambiguous fact that is equally capable of supporting other reasonable inferences clearly inconsistent with guilt," the pyramiding of inferences during the process of logical deduction becomes speculative and insufficient to prove guilt beyond a reasonable doubt. *Id.* at 582.

Additionally, "[t]he doctrine of spoliation provides that 'the deliberate or negligent destruction of relevant evidence by a party to litigation may give rise to an inference that the destroyed evidence was unfavorable to that party.'" *McAdam v. Grzelczyk*, 911 A.2d 255, 261 (R.I.2006) (quoting *Mead v. Papa Razzi Restaurant*, 840 A.2d 1103, 1108 (R.I.2004)).

With respect to impermissible pyramiding of inferences, defendant accurately outlines this Court's holdings in *Caruolo*, 524 A.2d at 581, and *In re Derek*, 448 A.2d at 768. However, this case involves no such impermissible speculation. In ruling on defendant's motion for a new trial, the trial justice outlined the evidence adduced by the state that supported the jury's verdict:

"The test on a motion for new trial of this sort has been articulated appropriately by [the state]. I did give the destruction of evidence charge, the so-called spoliation instruction, to the jury. They were free to consider it. This case was principally one that involved the credibility of the state's witnesses, because [Officer] Dennett's uniform had been destroyed or discarded within a week or so after the incident. Plainly, notwithstanding the absence of the clothing, and notwithstanding the spoliation instruction that I gave to the jury, these jurors accepted the testimony of the officers who said that [Officer] Dennett's uniform reeked of urine and the smell of feces. Obviously, the jury accepted the testimony of [Officers] Dennett and Violante with respect to the defendant bragging about having splashed this concoction of disgusting mixture in [Officer] Dennett's torso area, as well as his face.

"I expect also that they found impressive the fact that [Officer] Dennett testified that he was obliged to undergo subsequent blood tests to insure he had not contracted some disease as a result of having some of the cup's contents splashed in his face. Credibility decisions are quintessentially entrusted to

jurors. And, from my vantage point, I can't fault this panel for accepting the testimony of the state's witnesses as credible. The motion for new trial is denied."

The evidence presented required no impermissible inference to find that defendant's cup actually contained the offending bodily fluid and that the mixture of urine and feces splashed onto Officer Dennett's uniform and face; instead, it was the testimony of witnesses with intimate sensory knowledge of the fluid on Officer Dennett's uniform that inculpated defendant.

Furthermore, although the defendant repeatedly refers to Officer Dennett's soiled uniform and the Styrofoam cups found in his cell as "exculpatory evidence," nothing in the record even arguably indicates that these items were, in fact, exculpatory. Moreover, although the defendant argues that the soiled uniform and cups were destroyed intentionally and · in bad faith, the evidence presented at trial indicates otherwise. First, a number of witnesses testified that preserving the items risked contaminating areas of the DOC accessible to inmates and staff and further exposed both inmates and guards to potentially biohazardous material. Additionally, the investigating officers from the State Police and the ACI determined that the witnesses' statements, the defendant's statements to correctional officers, and photographs were sufficient evidence to bring charges against the defendant. Testimony also indicated that, contrary to the defendant's assertion, it was not the investigators' routine practice to preserve urine and/or feces-stained uniforms after an officer had been "served." Therefore, the trial justice committed no error in denying the defendant's motion for a new trial.

### Conclusion

For the reasons set forth herein, the judgment of the Superior Court is af-firmed. The record shall be remanded to the Superior Court.