**Jo–An KRIVITSKY** [1]

v.

**Brian D. KRIVITSKY.**

**Nos. 2010–267–Appeal, 2010–415–Appeal.**

Supreme Court of Rhode Island.

April 17, 2012.

---

1. Although Ms. Krivitsky's first name sometimes appears as "Jo–Ann" in various court documents and filings, we use "Jo–An" as it is spelled by the parties in their submissions to this Court and in their marriage certificate.

Robert S. Parker, Esq., Providence, for Plaintiff.

Brian Krivitsky, pro se, defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

The defendant, Brian D. Krivitsky, appeals *pro se* from two Family Court orders authorizing a commissioner to sell the defendant's real property to satisfy the child-support arrearage he owes to the plaintiff, Jo–An Krivitsky. Brian [2] argues that the Family Court's ordered sale of his home was error because (1) the Family Court lacked jurisdiction over the case; (2) the commissioner was without proper authority to sell Brian's home; and (3) there had been no prior precise determination of Brian's child-support arrearage. Further, Brian alleges that various judicial improprieties occurred in the Family Court throughout the course of the litigation. This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After reviewing the record and considering the parties' written and oral submissions, we are satisfied that this appeal may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the orders of the Family Court.

## I

### Facts and Procedural History

On May 15, 2006, a final judgment of divorce was entered dissolving the marriage of Brian and Jo–An. At that time, defendant was ordered to pay $200 per month in child support for the parties' minor children. The defendant's child-support obligation later was modified by the then-chief judge in an order entered on December 10, 2007, thereby increasing Brian's support payments to $250 per week. On December 31, 2007, Brian petitioned this Court for a writ of certiorari to review the order modifying his child support.

On March 28, 2008, we issued an order granting Brian's petition and instructing that "[t]he papers in the case" were to be retained in the Family Court so that, "on the earliest date practicable," the hearing justice could issue an appropriate decision, "contain[ing] the necessary findings of fact and conclusions of law" on Jo–An's motion to modify Brian's child-support obligation. This Court also indicated that the Family Court was entitled to supplement the record with additional testimony or evidence. The order specified that the December 10, 2007 order, requiring Brian to pay $250 per week in support, "remain[ed] in effect pending further proceedings before the Family Court and this Court." Lastly, the order instructed that "[f]ollowing the Family Court's decision, the papers in the case shall be transmitted to this Court pursuant to the writ. Pending the decision, further proceedings on certiorari are hereby ordered stayed."

Pursuant to this Court's directive, on May 6, 2008, a hearing was held in the Family Court before the chief judge for the parties to present additional evidence concerning Jo–An's motion for modification of child support. At this hearing,

---

2. In this opinion, we refer to defendant as Brian and to plaintiff as Jo–An for the pur- pose of clarity only. We intend no disrespect.

Brian was questioned about his income, assets, and expenses pertinent to the December 10, 2007 modification order. Specifically, Brian was pressed on how he could afford $10,000 a year for travel expenses, $2,400 a month for a mortgage payment, $8,000 a year for property taxes, and $290 a week for personal spending money, in addition to credit-card debt, on a salary of little more than $1,000 a month. In response, Brian indicated that he had obtained money from the sale of family-owned real property in Massachusetts and had also borrowed money from a friend. Counsel for Jo–An argued that defendant had an ability to earn an annual income of $86,906. In contrast, Brian stated that he did not believe he should owe any child support in light of Jo–An's "very strong" financial standing.

On February 19, 2009, the chief judge entered an order appointing a commissioner authorized to sell Brian's thirty-one-foot boat to satisfy Brian's outstanding obligations to Jo–An, Jo–An's counsel, and the guardian *ad litem*.[3] The commissioner subsequently became involved with the marketing and sale of Brian's home located on Middlebrook Lane in Lincoln.[4] On November 17, 2009, an order was entered,

declaring: "[Brian] and Your Commissioner will work in conjunction with the real estate agent to execute a listing agreement with the sales price in the amount of Six Hundred Ninety–Nine Thousand ($699,000.00). All offers will be made to [Brian] and/or Your Commissioner."[5] Notably, Brian signed the order, indicating his assent thereto.[6]

On November 20, 2009, the chief judge issued a written decision in response to this Court's order requesting specific findings to support the December 10, 2007 modification order. The decision stated that "[t]here has been a substantial change of circumstances to warrant a modification of child support based upon the increase in income of [Brian]." The chief judge supported his decision by finding: (1) Brian was inconsistent concerning his finances and, therefore, was not credible; (2) Brian was "underemployed and c[ould] earn Eighty–Five Thousand ($85,000) dollars a year considering his education and experience in business;" and (3) Brian had "the ability to pay the increase in child support."[7] As a result, an order was entered on January 5, 2010, requiring Brian to pay Jo–An $250 per week to support the parties' minor children.[8]

3. At that time, Brian owed the guardian *ad litem*, who had been appointed by the chief judge in March 2008, to aid in the resolution of child custody and placement issues, an outstanding balance of $1,400.

4. It is unclear the exact date when the commissioner initially became authorized to market the Middlebrook Lane property. An order dated May 26, 2009, purported to bestow such authority, as it states: "The [commissioner], who has already, by agreement of the parties, been appointed to market and sell the motor vessel of [Brian], is further authorized to oversee and conduct the marketing and sale of [Brian's] real estate located at 6 Middlebrook Lane in Lincoln, Rhode Island." However, this order was not signed by a Family Court justice.

5. The $699,000 figure was requested by the commissioner in his November 2, 2009 supplemental commissioner's report to the Family Court.

6. Brian marked his assent to this order by signing his name next to the handwritten phrase "assented to."

7. The Family Court docket sheet indicates that on December 21, 2009, the record was transferred to this Court.

8. On January 14, 2010, Jo–An made an *ex parte* motion to this Court to remand the file to the Family Court for pending motions to be heard on February 3, 2010. This Court granted said motion on January 29, 2010, and stated that "[f]ollowing said hearing, the pa-

Thereafter, the litigation in Family Court transformed into a quest to liquidate assets to satisfy Brian's outstanding support obligations—the sale of the Middlebrook Lane property being the central focus. After already having reduced the listing price of the property to $649,000, the chief judge held a hearing on April 1, 2010, to determine whether an additional listing reduction was prudent.[9] At the hearing, Carol Lamontagne, the real estate broker for Brian's property, testified that her updated "market analysis" of the property resulted in a recommendation that the Middlebrook Lane property be listed at $548,600. Ms. Lamontagne explained that her recommendation was based on her analysis of the current real estate market, as indicated by comparable home sales in the area, as well as the condition of the home's roof.[10] Additionally, Ms. Lamontagne noted that the only significant interest or activity concerning the property had been an offer for purchase in the amount of $525,000. Ultimately, an order was entered on May 14, 2010, stating that "[t]he [c]ourt [would] only consider offers of $550,000.00 or more to purchase [Brian's] property located in Lincoln, Rhode Island."

Another hearing was held on May 21, 2010, concerning the Middlebrook Lane property, this time before a different hearing justice. The hearing justice was presented with two appraisals of the property: one estimating the market value of the property at $570,000, and the other at $575,000. Brian urged that such prices were not "fair" to him and that, in any event, his property should not be sold at all. To that end, he suggested that the case was not properly before the Family Court because, according to Brian, the case file should have been returned to this Court.[11]

Brian's argument prompted the hearing justice to inquire how "the order for sale of this particular domicile [came] to pass." In response, the commissioner explained that he became involved in the marketing and sale of the Middlebrook Lane property because it "was the only * * * asset that existed in order to pay [Brian's] obligation," considering that the insurance policies already had been liquidated and Brian's boat had proved unmarketable. The hearing justice then directed the parties to present him with a specific order authorizing the commissioner to sell the home without Brian's consent. No order was presented to his satisfaction,[12] leaving the

pers shall be returned to this Court forthwith."

9. This hearing also dealt with the resolution of the liquidation of some of Brian's other assets. At the commissioner's request, Brian's boat was ordered to be sold for $25,000. Also, two insurance policies belonging to the parties had been liquidated. As a result of this liquidation, Jo–An received her half of the proceeds, approximately $8,700, and the remaining estimated $8,700 was put into escrow and ordered by the court to serve as a credit toward Brian's child-support arrearage.

10. Although the parties did not dispute that the roof needed replacement, there was disagreement about the cost of such replacement. Ms. Lamontagne testified that it would cost between $20,000 and $30,000. In contrast, Brian presented his own estimate of about $8,000 to the court.

11. Notably, Brian indicated that if this Court determined that the child-support modification order was "justified," he would "owe [Jo–An] about $20,000." However, according to Brian, if the modification were to be overturned, he had "overpaid" his child support.

12. In fact, the commissioner indicated that he believed he was unable to act in Brian's place to sign a deed in the event that Brian disagreed with the sale of the real estate. Instead, he noted that "[e]verything was at the [c]ourt's discretion."

hearing justice to conclude that there was no "order authorizing [Brian's] home to be sold without his permission for a given price." The hearing justice then stated that he would permit Brian two weeks to determine with this Court whether "anything further should be done here." Thereafter, Jo–An filed a motion to authorize the commissioner to sell the Middlebrook Lane property for any sum determined reasonable by the court.

The hearing justice held a hearing on Jo–An's motion on July 1, 2010. At this hearing, the commissioner informed the court that an offer to purchase the Middlebrook Lane property had been made for $570,000—a price the commissioner noted was remarkably close to the property's appraised value. The hearing justice then explained that he interpreted the November 17, 2009 order [13] as enabling the commissioner to execute a purchase and sale agreement without the consent of Brian. He further determined that $570,000 was "a fair and reasonable price, taking into consideration the fact [that] this property ha[d] been on the market * * * between a year, and a year-and-a-half." Accordingly, the hearing justice ruled that the commissioner was "hereby authorized to enter into any type of contract, if necessary, to liquidate that property for $570,000." On July 9, 2010, a written order was entered to the same effect.[14] Brian filed a notice of appeal from this order on July 28, 2010.

By an order entered August 19, 2010, the commissioner was authorized to close on the sale of the Middlebrook Lane property on August 31, 2010.[15] On August 25, 2010, this Court ordered a temporary stay of the July 9, 2010 order authorizing the commissioner to sell the Middlebrook Lane property.[16] Thereafter, on August 30, 2010, Brian filed a notice of appeal from the Family Court's August 19, 2010 order.

On December 17, 2010, this Court entered a corrected order. In that order, we stated: "the Family Court having satisfied our directive to render an appropriate decision with respect to [Jo–An's] motion to modify [Brian's] child-support obligation, the petition for certiorari is denied and dismissed and the writ previously issued is hereby quashed." Further, this Court also ordered that Brian's two pending appeals be expedited on the prebriefing conference calendar. Additionally, we granted Jo–An's motion to remand the case to the Family Court for a hearing on her motion requesting that money Brian had obtained from the sale of his interest in Massachusetts real estate be placed in escrow. We ordered that such hearing be held within forty-five days of our order and that, following such hearing, the papers "be returned to this Court forthwith."

Pursuant to this Court's directive, the hearing justice held a hearing on January 19, 2011.[17] At this hearing, Brian testified

---

13. The hearing justice referred to the order as being dated November 3, 2009; however, it appears from his recitation of the order that he was, in fact, referring to the order dated November 17, 2009.

14. This order was signed by the general magistrate who previously had recused himself from the case.

15. At the request of the commissioner, a hearing was held on August 10, 2010, to determine if the closing could be expedited. At that hearing, the hearing justice determined

that the closing date would remain scheduled for August 31, 2010.

16. This stay was continued by order of this Court on September 23, 2010, and the Family Court file was ordered "transmitted to this Court forthwith." The papers were returned to the Supreme Court on September 27, 2010.

17. An official transcript of this hearing was not submitted to this Court; however, a copy of the transcript was appended to Jo–An's prebriefing statement.

that of the $132,270 that he had received from his interest in the Massachusetts property, he had expended all but approximately $2,000. Brian indicated, however, that he was owed an additional estimated $20,000 from the sale of such property and that he would be willing to put such money into escrow. He also stated that he had $4,500 available and would pay that money directly to Jo–An.[18] An order to this effect was entered on February 17, 2011.

On May 26, 2011, this Court granted Brian's motion to consolidate his appeals.[19] We discuss additional facts in the context of the issues raised on appeal.

## II

### Discussion

### A

### Jurisdiction

Brian argues that the Family Court lacked jurisdiction to enter the appealed orders pursuant to this Court's issuance of a writ of certiorari on March 28, 2008. He argues that we ordered the papers to be retained in this Court "and that issues of [c]ertiorari were to be [s]tayed," but that "this was never done." As a result, he maintains, "[t]he issues being argued here should never have been in front of the Family Court."

■ "Whether the Family Court has jurisdiction over a claim is a question of law that we review *de novo*." *Beauregard v. White*, 972 A.2d 619, 626 (R.I.2009). It is well established that once an appeal has been docketed and the papers of a case transmitted to this Court, the trial court is divested of its power to act in the case.

*Thompson v. Thompson*, 973 A.2d 499, 513 (R.I.2009); *Cavanagh v. Cavanagh*, 119 R.I. 479, 485, 380 A.2d 964, 968 (1977). "To avoid the harsh consequences of this rule, a party may seek to remand the case temporarily for the resolution of motions for relief that are necessary and appropriate." *Thompson*, 973 A.2d at 513.

■ In this case, we granted Brian's petition for certiorari on March 28, 2008. At that time, however, we did not divest the Family Court of its jurisdiction over the case. Instead, we ordered that the Family Court retain the papers in the case for the purpose of rendering an appropriate decision on Jo–An's motion to modify Brian's child-support obligations. We further instructed that following such a decision by the Family Court, "the papers in the case shall be transmitted to this Court pursuant to the writ," but "[p]ending the decision, further proceedings on certiorari are hereby ordered stayed." Thus, pursuant to the terms of this order, it is without question that the Family Court retained its authority over this case at least for such time as it took to render an appropriate decision supporting the modification of Brian's child-support obligation.

The chief judge issued such a decision on November 20, 2009, and the papers were transmitted to this Court on December 21, 2009. Thereafter, on January 29, 2010, we granted Jo–An's motion to remand the file to the Family Court for a hearing on pending motions. On that same day, we transmitted the papers to the Family Court. The Family Court retained the papers from then until September 27, 2010, when this Court ordered the file to be transmitted to us forthwith. It is in

---

18. Jo–An contends in her prebriefing statement to this Court that Brian has not paid her the $4,500 to date.

19. Although Brian's appeals are based upon orders and not final judgments, they are properly before this Court as appeals from the ordered sale of real property. *See* G.L.1956 § 9–24–7.

this time period, between January 29, 2010 and September 27, 2010, that the orders from which Brian has appealed were entered. Accordingly, because the papers had been remanded, the Family Court was acting within its authority when the orders of July 9, 2010, and August 19, 2010, were entered. *See Cavanagh*, 119 R.I. at 485–86, 380 A.2d at 968 (holding that "once a case has been docketed here it is no longer before the trial court and that court can take no action on it until the papers are remanded there").

Although we are hard-pressed to determine why it took nearly twenty months for the Family Court to issue a decision containing the necessary findings of fact and conclusions of law "on the earliest date practicable," the Family Court clearly retained jurisdiction until the papers were, in fact, docketed in the Supreme Court on December 21, 2009. Shortly thereafter, the papers were remanded to the Family Court for a discrete hearing to be held on February 3, 2010. Rather than returning the papers to the Supreme Court at the conclusion of the hearing, however, the Family Court retained them for another nine months until we ordered that the file be transmitted forthwith, during which period the two orders from which Brian appeals were issued. We do not countenance this practice and believe it to be the responsibility of both the trial court and the parties to assure that the record of cases on remand from this Court are returned as expeditiously as possible. Nevertheless, we are satisfied that the two orders under review in this case were properly entered in the Family Court.

## B

### The Ordered Sale of the Middlebrook Lane Property

Brian further argues that for his "home to be * * * sold, at a significant loss and significantly below market, is unreasonable, unfair, and unethical." Specifically, Brian contends that there was no order giving the commissioner permission to sell his home; rather, he maintains that he was selling his home "on his own volition," for a price he determined, and the commissioner was merely "to look into what [Brian] was doing regarding the marketing and listing" of the property. In addition, Brian argues that the amount of his child-support arrearage should have been calculated before determining what assets should be liquidated. Lastly, Brian states that his home should not be sold because other "significant assets remain available" to satisfy his child-support arrearage.

The Family Court is given broad jurisdiction "to hear and determine * * * all motions for * * * support and custody of children," all "other matters arising out of petitions and motions relative to real and personal property * * *, and such other equitable matters arising out of the family relationship, wherein jurisdiction is acquired by the court by the filing of petitions for divorce, bed and board and separate maintenance * * *." G.L.1956 § 8–10–3(a). Further, any child-support orders that go unpaid "shall be regarded as a judgment for debt so that suits may be brought or executions may issue on it for amounts due and unpaid, * * * the executions to run against the goods and chattels of the husband or wife," and "the court may make all necessary orders and decrees concerning the suits or executions." G.L.1956 § 15–5–16.3.

Brian contests the manner in which the Family Court sought to satisfy his arrearage. However, Brian agreed to list and sell his Middlebrook Lane property. This much is shown through his marked assent to the November 17, 2009 order of the Family Court. *See Vanderheiden v. Mar-*

*andola,* 994 A.2d 74, 78 (R.I.2010) (stating that parties are bound to the terms of a consent order because "[a]lthough [a consent order] 'receives a court's imprimatur,' [it] is 'in essence a contract' and therefore must 'be construed as a contract * * *'" (quoting *Now Courier, LLC v. Better Carrier Corp.,* 965 A.2d 429, 435 (R.I.2009))). Thus, because Brian clearly assented to the sale of the Middlebrook Lane property, he will be held to his agreement.

Nevertheless, Brian asserts that he agreed to sell his home at his own direction, and not that of the Family Court or the commissioner. This argument is also unavailing. The Family Court was well within its authority to order the sale of the Middlebrook Lane property. *See* § 15–5–16.3; *Cardenas v. Cardenas,* 478 A.2d 968, 970 (R.I.1984) (stating that the Family Court has "broad authority to assign property or issue execution against the estate of either party" in order "to secure the payment of all past and present support orders"); *Brierly v. Brierly,* 431 A.2d 410, 416 (R.I.1981) (stating that the Family Court has "authority in a divorce proceeding to assign or attach the estate of either party to secure payment of child support and alimony"). Further, it was entitled to facilitate such a sale through the use of a commissioner—as was assented to by both parties. *See Duke v. Duke,* 675 A.2d 822, 824 (R.I.1996) (holding that if the defendant declines to assign ordered pension funds to the plaintiff, "the Family Court may appoint a special master, and the administrator of the fund may be required to honor an assignment of the defendant's pension funds when executed either by the defendant or by the special master"). Thus, we find no error in the Family Court's July 9, 2010 order authorizing the commissioner to execute a purchase and sale agreement in the amount of $570,000 for the Middlebrook Lane property, nor in its August 19, 2010 order scheduling such property's closing.

It is without question that Brian was, as of the date of oral argument before this Court, in substantial child-support arrears. At a hearing on May 21, 2010, he candidly acknowledged that he would "owe [Jo–An] about $20,000" in child support if his challenge of the child-support modification order was dismissed by this Court. Thereafter, we denied and dismissed Brian's petition for certiorari, thereby letting stand Brian's obligation to pay Jo–An $250 per week in child support. Accordingly, by Brian's own concession he is thousands of dollars in arrears.

The defendant, of course, remains free to liquidate any asset he may own to satisfy his child-support arrearage. In light of his nonpayment, however, the Family Court possesses the authority to order the sale of his property to satisfy that obligation. Under the circumstances of this case, we are more than satisfied that the Family Court did not abuse its broad discretion by appointing a commissioner to facilitate the marketing and sale of defendant's Middlebrook Lane property at a reasonable price. However, the precise amount of the arrearage necessarily will have to be determined before plaintiff is paid from the proceeds of the sale.

## C

### Alleged Judicial Improprieties

Lastly, Brian asserts that the hearing justice "show[ed] a bias toward [Jo–An] and [her counsel], as he often * * * suggested strategy and actions to take against [Brian]" and allegedly made various accusatory statements to and about Brian. Brian also purports error in that the general magistrate, who had formerly recused himself from the case, signed an order in this case.

It is well established that "a party alleging judicial bias carries a substantial burden of proof to show that the asserted prejudice impaired the fairness of the trial." *In re Jermaine H.*, 9 A.3d 1227, 1230 (R.I.2010) (quoting *In re Shawn B.*, 864 A.2d 621, 624 (R.I.2005)). It must be proven that the Family Court justice "had personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his impartiality seriously and to sway his judgment." *Id.; see also State v. Howard*, 23 A.3d 1133, 1136 (R.I.2011); *Parrillo v. Parrillo*, 495 A.2d 683, 685 (R.I.1985).

It does not appear from the record that Brian moved for the recusal of the hearing justice [20] or objected to the general magistrate's signing of the July 9, 2010 order. As a result, under this Court's well settled raise-or-waive rule, Brian has waived any right to challenge these alleged judicial improprieties on appeal. *See In re Damien M.*, 819 A.2d 213, 213, 214 (R.I. 2003) (mem.) (holding that because the father had not "objected to the trial justice's questions, moved for a mistrial, or otherwise attempted to disqualify the trial justice because of his alleged improper questioning during the trial," he had "therefore waived any right to challenge the trial justice's alleged bias on appeal"). However, even if these issues properly had been preserved, they would not benefit Brian.

The general magistrate's signing of the July 9, 2010 order was a ministerial act without any real consequence on the disposition of this case. That order was the mere memorialization of a bench order given by the hearing justice. While a recused magistrate or justice should avoid any activity in a case from which he or she formerly is recused, we do not deem it *per se* error if one such magistrate or justice partakes in ministerial acts requiring no independent decision making. Thus, in this case, where the general magistrate merely signed an order that had already been effectuated by the oral order of the hearing justice, judicial partiality has not been established. *See State v. Lyons*, 924 A.2d 756, 763 (R.I.2007) (stating that defendant carries the "substantial burden of proof to show that the asserted prejudice impaired the fairness of the trial" (quoting *In re Shawn B.*, 864 A.2d at 624)).

Similarly, there is no merit to the allegation that the hearing justice exhibited partiality or bias. Brian points to what he claims was the hearing justice's "accus[ation] [that Brian was] intimating to the [c]ourt that he [was] an expert on roofing" [21] and his statement that Brian

---

20. On January 6, 2009, Brian did, in fact, move to recuse the chief judge.

21. The colloquy Brian refers to occurred at the July 1, 2010 hearing, and transpired as follows:

"[Brian]: * * * I would like to address the comments that [Jo–An's counsel] said. First of all, he's saying that I don't—that I've only been in the real estate business for a few years. That's totally false, because—

"[The Court]: Well, you were casting dispersions [*sic*] on [Jo–An's counsel]. What does that have to do with the issue before the court this morning? If the two of you

don't get along, it has no impression on me, whatsoever.

"[Brian]: Credibility-wise, I mean; the fact that he's making you to believe that I'm not telling the truth, and I am absolutely telling the truth. I have been doing that for as long as I told you. I worked for the largest public syndicator in the country for years. I started developing property on my own. I have a very successful project north of Boston. I owned a home improvement contracting business after I was married, and you know I've done—I've owned a lot of property, rental property. So, for him to say that—

was "having fun with this," [22] to show such bias. These statements, at best, represent mere criticism by the hearing justice, which this Court consistently has held is insufficient to establish judicial bias. *See Lyons,* 924 A.2d at 763; *In re Damien M.,* 819 A.2d at 213. In fact, upon our review of the record, it is clear to us that the hearing justice exhibited great patience and impartiality in the face of Brian's continued lack of cooperation and unabashed attempt to avoid his court-ordered obligation to pay child support. We therefore conclude that the hearing justice maintained the requisite judicial impartiality and that Brian's assertions are without merit.

## III

### Conclusion

For the reasons stated in this opinion, we affirm the orders of the Family Court. The record shall be remanded to the Family Court for further proceedings in accordance with this opinion and with full confidence that the Family Court will bring the tortuous travel of this case to an expeditious conclusion.

"[The Court]: You're not in a position to testify as an expert relative to the cost of roofing.

"[Brian]: I didn't say that.

"[The Court]: That's what you were intimating to the court; there was some type of conspiracy, again, concerning the value the particular realtor put on for the repair of the roof."

22. At the August 10, 2010 hearing, the hearing justice stated to Brian: "You seem to enjoy this." To which Brian responded: "No, I don't."